IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE: HEILIG-MEYERS COMPANY, et al.,

Debtors.

HEILIG-MEYERS COMPANY, et al.,

Appellants,

v.

WACHOVIA BANK, N.A., et al.,

Appellees.

Civil Action Number 3:05CV250-JRS

## <u>MEMORANDUM OPINION</u>

APPELLANT Heilig-Meyers Company and five of its wholly-owned subsidiaries appeal the decision by the United States Bankruptcy Court for the Eastern District of Virginia that debtors were solvent on the date of alleged preferential transfers to Wachovia Bank, N.A. and others (collectively "the lenders"), as part of a financial restructuring on May 25, 2000. In the underlying bankruptcy proceeding, the Appellant's Committee of Unsecured Creditors sought to avoid the transfer of cash and liens to the lenders. The debtors argue that the Bankruptcy Court improperly applied the balance sheet test and relied upon the analysis of the creditor's expert on the mistaken belief that such expert executed a balance sheet test of the debtors' solvency. The debtors submit that rather than being solvent by approximately $40,000,000 as found by the Bankruptcy Court, debtors were actually insolvent by more than $175,000,000 at the time of the transfers.

The record for this appeal is extensive and the briefs have been expanded from thirty pages to almost fifty pages. Brevity does not appear to concern the parties to this appeal. Fortunately,

Judge Tice's Opinion is detailed in its factual findings and accurate in its legal determinations which bodes well for applying the standard of review applicable on appeal.

The parties concede that this Court reviews the bankruptcy court's factual findings for clear error and the legal determinations de novo.  The Bankruptcy Court's findings of fact will not be set aside unless clearly erroneous.  See Bankr. R. 8013; In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992).  When applying the clearly erroneous standard, "findings of fact will be affirmed unless [the appellate court's] review of the entire record leaves [it] with the definite and firm conviction that a mistake has been committed."  Harman v. Levin, 772 F.2d 1150, 1153 (4th Cir. 1985).  "If the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous*." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985) (emphasis added).

The bankruptcy court has broad discretion when considering evidence to support a finding of insolvency.  "Insolvency is a question of fact . . . and the findings of the Bankruptcy Court in this regard will not be disturbed unless they are clearly erroneous." In re Roblin Indus., 78 F.3d at 35 (internal citations omitted).  Therefore, the debtor in this appeal must establish that the bankruptcy court's findings are clearly erroneous.

Generally, the bankruptcy trustee may seek to avoid any transfer of property by the debtor

> (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made – (A) on or within 90 days before the date of the filing of the petition . . . and (5) that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under chapter 7 of [Title 11]; (B) the transfer had not been made; and (C) such creditor received

payment of such debt to the extent provided by the provisions of this
title.

11 U.S.C. § 547(b).  The burden is on the trustee to prove the avoidability of a transfer under

subsection (b); however, "the debtor is presumed to have been insolvent on and during the 90 days

immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).  In an earlier ruling,

which the debtors did not appeal, the bankruptcy court found that the lenders rebutted the

presumption of insolvency created by the Bankruptcy Code, thus shifting the burden to the debtors

to prove their insolvency.  In reaching the decision underlying this appeal, the bankruptcy court

found that the debtors were solvent at the time of the transfers, i.e. that the debtors did not carry their

burden, and so the court did not reach the new value or ordinary course of business defenses.  See

11 U.S.C. § 547(c).

i.

This case suffers from a long procedural history that spans almost five years on the

Bankruptcy Court's docket.  The Court will not add to the length of the record in this case with a

detailed historical discussion.  On August 16, 2000, Heilig-Meyers and its five subsidiaries filed

voluntary chapter 11 (reorganization) petitions.  Almost two years later, the Committee of Unsecured

Creditors initiated an adversary proceeding into the May 25, 2000 transfers.  On October 29, 2003,

the bankruptcy court denied debtors' partial summary judgment motion, holding that cash transfers

in excess of $100,000,000 from the sale of debtors' Puerto Rican subsidiaries (known as the Berrios

transfers) occurred outside of the preference period.

On September 25, 2003, the lenders filed a motion for summary judgment, seeking a

determination as to the proper standard to use in valuing the debtors' solvency and to establish that

the lenders sufficiently rebutted the debtors' presumption of insolvency for purposes of the May 25,

3

2000 transfers.  The bankruptcy court found that the lenders rebutted the presumption but denied summary judgment on the proper valuation standard for the insolvency analysis.  During the November 2003 trial, only three issues remained: the solvency of the debtor on May 25, 2000 and the new value and ordinary course of business defenses raised by the lenders.

The debtors functioned through a series of complex financial arrangements.  Heilig-Meyers financed its capital needs through six separate credit facilities as summarized by the Bankruptcy Court:

(1) The Prudential Notes: Heilig-Meyers guaranteed $60,000,000 in 11.99% Series A Guaranteed Senior Notes purchased by Prudential.  The notes were issued in January of 1995 and due in 2002;

(2) Wachovia Credit Agreement: Heilig-Meyers acted as guarantor in a deal whereby Wachovia provided up to $400,000,000 in revolving loans and letters of credit to Heilig subsidiaries;

(3) Wachovia Synthetic Lease: In 1996, Heilig-Meyers guaranteed two synthetic lease arrangements with Wachovia on certain properties in Virginia, Kentucky and Texas.  As explained by the debtors, a synthetic lease is a financing device used to turn a liability on a lessee's balance sheet into an expense on the lessee's income statement;

(4) First Union Synthetic Lease: Heilig-Meyers guaranteed a similar lease agreement with First Union in 1998;

(5) Bonds: In 1996, Heilig-Meyers guaranteed the obligations of a series of three unsecured notes totaling $475,000,000 due in 2002, 2003 and 2007; and

(6) The Accounts Receivable Securitization Facilities: These facilities provided the debtors with $80,000,000 in monthly working capital.  By these arrangements, Heilig-Meyer's subsidiary MacSaver Financial Services transferred the consumer litigation contracts generated by the Furniture Company, another subsidiary, to a Master Trust.  The Master Trust issued certificates to investors and the Master Trust purchased the installment sales contracts from MacSaver.  By the end of 2000, Heilig-Meyers serviced obligations under three securitization facilities: (i) the 1997-1 certificates in the amount of $115,000,000; (ii) the 1998-1 certificates in the amount of $400,000,000 and (iii) the 1998-2 certificates in the amount of $311,000,000. Heilig-Meyers and its subsidiaries received advances at the rate of approximately 85% of eligible receivables and paid interest on the certificates ranging from 5.2%

4

to 6.6% per annum.

The 2000 calendar year presented debtors with a number of financial challenges.  The Credit

Agreement was scheduled to mature in July of 2000; the commitment termination date for the 1997-

1 certificates was scheduled to occur in July of 2000; the First Union Synthetic was scheduled to

mature and unless extended would require repayment of $15,000,000; Heilig-Meyers faced the

possibility having to fund a $40,000,000 spread account under its securitization facilities if its debt

rating fell and as early as August 2000, Heilig-Meyers would be required to establish a sinking fund

that would reduce its cash flow from the Master Trust by $20,000,000 each month.

With these looming obligations, the debtors sought to restructure their finances in May of

2000.   The debtors and their lenders executed a series of agreements that included maturity

extensions and grants of collateral to the lenders.  These arrangements are collectively referred to

as the May 25, 2000 restructuring.  "Between the closing of the May 25 transactions and the filing

of debtors' bankruptcy petitions, debtors continued to borrow money from and make cash payments

to the lenders under the revolving line of credit."  Heilig-Meyers Co. v. Wachovia Bank, N.A. (In

re Heilig-Meyers), 319 B.R. 447, 455 (Bankr. E.D. Va. 2004).

ii.

Judge Tice confined his Opinion to the issue of debtors' solvency at the time of the May 25

restructuring pursuant to § 547(b)(3).[1]  On appeal, the reviewing court must be careful to separate

---

[1]In its earlier decision on the lenders' summary judgment motion, the Bankruptcy Court
found that the lenders successfully rebutted the debtors' insolvency based, in part, on financial
statements showing shareholder equity in excess of $500,000,000 as of February of 2000;
debtors' August 16, 2000 bankruptcy schedule stating shareholder equity in excess of
$400,000,000 and statements by debtors' senior management that the debtors were solvent on
May 25, 2000.  As mentioned above, the burden of proof shifted to the debtors to prove their
insolvency by a preponderance of the evidence.

5

the factual findings by the bankruptcy court from the legal conclusions.  The standard of review and the need to distinguish between factual and legal findings are of obvious importance to this appeal because the parties do not dispute that Judge Tice identified the proper legal test to determine the debtors' solvency.

The definition of insolvency nicely frames the issue.  An insolvent debtor's financial condition is such that "the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation*." 11 U.S.C. 101(32)(A) (emphasis added).  Stated differently, the dollar value of the debtor's debts exceed his assets.  The qualification of "a fair valuation" in the definition often requires that the judge sort through the differing presentations by the parties' valuation experts and to make factual findings.  Not surprisingly in this case, the two valuation experts reached vastly different conclusions regarding the value of the debtors' assets.

The debtors concede that the balance sheet test of insolvency, as described by the Second Circuit in <u>Lawson v. Ford Motor Company</u> (<u>In re Roblin Industries</u>), 78 F.3d 30 (2nd Cir. 1996), is the proper method for analyzing the financial health of the debtor.  By this method, the court receives the expert appraisals  which conclude with a dollar figure of the debtor's solvency.  As a threshold matter, Judge Tice considered whether, on the date of the transfers, the debtors collectively operated as a going concern or were on their deathbed.  <u>In re Heilig-Meyers</u>, 319 B.R. at 457.  The conclusion that a debtor is a going concern or on its deathbed dictates whether to value the debtor's assets based on their liquidation value or the value they would fetch if sold over a reasonable period of time; the assumption being that a going concern could wait for a better offer and presumably a higher price. As such, there is value to being a going concern.

A debtor lies on its deathbed where the debtor  is "in a precarious financial condition" so that "liquidation was imminent when the petition was filed." <u>In re Miller & Rhoads</u>, 146 B.R. 950, 955-

56 (Bankr. E.D. Va. 1992).  Often such a debtor cannot continue to operate post-petition.  In this case, the Bankruptcy Court found that while a restructuring may have been necessary on the transfer date, "the debtors were operating as a going concern on May 25, 2000" and that "there is no doubt that the debtors had sufficient assets to continue operating for some period into the future."  In re Heilig-Meyers, 319 B.R. at 458.

As a going concern, the court applies the balance sheet test to measure the debtors' solvency.  The balance sheet method "contemplates a conversion of assets into cash during a reasonable period of time."  Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 194 (3rd Cir. 1998).  "Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."  Lawson v. Ford Motor Co. (In re Roblin Indus.), 78 F.3d 30, 36 (2d Cir. 1996).

The evidence in this case came primarily from the parties' experts: Jonathan Cleveland for debtors and Ronald Greenspan for the lenders.  Debtors contend that the Bankruptcy Court committed clear error by relying on Greenspan's report in arriving at the solvency determination.  Debtors claim that Greenspan did not perform a balance sheet valuation; rather, Greenspan used the values he derived from his market multiple methodology and adjusted the asset values on the debtors' balance sheet to arrive at his previous solvency conclusion.  The debtors take issue with the Bankruptcy Court's reliance on Greenspan's values after the court rejected his use of a control premium.[2]  According to the debtors, Greenspan simply adjusted the asset values until he arrived at

---

[2]As part of his enterprise valuation of the debtors, Greenspan determined the market value of the enterprise through a market multiple approach.  Greenspan selected guideline companies, those that are operationally and economically similar to the debtors, to arrive at the appropriate multiples.  The multiples are calculated based upon the stock market trading prices of the

a solvency amount of $218,000,000; however, the debtors contend that by rejecting the control premium of approximately $200,000,000, the bankruptcy court should have debited $200,000,000 from the various assets assessed under the court's balance sheet analysis whenever it relied on Greenspan's valuations.

iii.

Cleveland concluded that on May 25, 2000, the debtors were insolvent by $330,000,000. Underlying Cleveland's report is the assumption that the debtors were on their deathbed as of the transfer date and the report suggests that Cleveland's asset valuations were influenced by post-petition liquidation sales rather than the value the asset would fetch when sold by a going concern.

Greenspan found the debtors to be solvent with a net worth of $218,000,000. To calculate the market value of the debtors as an enterprise, Greenspan used a market multiple approach. Greenspan chose comparable companies and analyzed their financial information to derive multiples that he would use develop value indicators. Greenspan then applied those multiples to the debtors' earnings and cash flow. Greenspan also added a control premium to the multiples. Greenspan also produced an individual asset and liability balance sheet analysis that indicated stockholder equity of $218,000,000 – the same number he arrived at through his enterprise valuation. It is this latter valuation method that is the subject of the bankruptcy court's opinion.

Debtors' quarterly report ending May 31, 2000 reported assets of $1,354,710,000, liabilities of $836,298,000 and positive stockholder equity over $500,000,000. Cleveland appraised the same

---

comparable companies. Greenspan then added a control premium to the multiples, representing additional value attributable to a controlling interest in the company. According to Greenspan's report, the premium "is developed through an analysis of premiums paid in recent acquisitions of companies in the same or similar industries" and is defined as "the additional consideration that an investor is willing to pay . . . over the marketable minority equity value . . . in order to gain control of a company."

assets at $459,548,000; Greenspan appraised the assets at a fair value of $1,012,040,000. As a result of the vast difference in the appraisal value of the assets, the solvency determination differed by over $550,000,000; what the bankruptcy court described as an "astonishing" difference. Given this wide disparity, Judge Tice was "unable to find that one expert report presents the correct valuation to the exclusion of the other." In re Heilig-Meyers, 319 B.R. at 460. Judge Tice recognized that both methods employed by the experts were widely accepted in the financial world but noted that the "absurdly disparate conclusions [gave] the court pause." Id. at 461.

During that pause, Judge Tice discussed the irony that judges, "few of whom would qualify as expert witnesses in any trial of asset valuation," are often called upon to determine the net worth of assets based on conflicting reports. Id. That said, Judge Tice plowed ahead with a more general description of the experts' methods followed by his own balance sheet test based upon both appraisal reports and other circumstances unique to the case. As to the methods, the court found that the Cleveland report "relies to some extent on post-petition sales of debtors' assets, which makes it more akin to a liquidation analysis than the required fair value analysis." Id. Therefore, the court concluded that Greenspan's report "seems to be the stronger of the two." Id.

While Greenspan's report persuaded Judge Tice that the debtors' were not insolvent on the date of the transfers, the court did not adopt Greenspan's valuation amounts outright. Instead, the court found it "difficult to accept Greenspan's equity determination at face value because the court is not certain that his method has fully factored in debtors' unique circumstances as disclosed by the trial record." Id. The court then briefly reviewed those circumstances before it engaged in its own balance sheet analysis.

The Court finds no error in Judge Tice's factual findings regarding the debtors' financial circumstances. Although the company reported annual revenues of almost two billion dollars into

the late 1990s, Heilig was substantially leveraged and heavily dependent on the cash flow from its securitization facilities.  However, the company's outdated credit practices pointed to a fundamental problem that threatened its cash flow.  While individual store locations were responsible for extending credit and receiving payment, the industry and nationwide trend for many years had been toward the universal use of credit cards.  Management began to recognize the problem in the latter part of the 1990s but many feared that it could not modernize in time.  When management decided not to pay bondholder interest due on August 1, 2000, the monthly securitization payments which sustained the company appeared threatened and left the company with little choice but to declare bankruptcy.[3]

Judge Tice did not adopt Greenspan's valuation method based, in part, on the debtors' unique financial situation.  Greenspan determined his market multiple by comparing Heilig's financial data to a group of publically traded furniture companies.  However, the evidence did not demonstrate that the financial circumstances of those companies substantially mirrored Heilig's securitization program and the looming threat to its cash flow.  Judge Tice also found fault with Greenspan's decision to include a control premium in his market multiple because of the implausibility that a real investor would purchase the debtors' assets without regard to Heilig's debt or its debt arrangements. In sum, Greenspan's report convinced the court that the debtors were solvent on the date of the transfers but that his method overstated the extent of the solvency.  Recognizing the court's limitations in its ability to reconstruct or refine Greenspan's market multiple valuation, the court determined to take the best of both reports and structure its own balance sheet test.

The debtors fault the bankruptcy court for relying on Greenspan's analysis.  Debtors claim

---

[3]The declaration came within days of the end of the 90 days preference period.

that Greenspan improperly used a market multiple valuation, incorporating a control premium, to arrive at a value for the company. From that value, debtors insist that Greenspan ignored the asset-by-asset approach authorized by In re Trans World Airlines and instead worked backwards from his solvency figure to value the individual assets. Debtors contend that Greenspan simply arrived at his predetermined conclusion.

The debtors describe Greenspan's method as follows: Greenspan began with the debtors' reported earnings before interest, taxes, depreciation and amortization (EBITDA) of $100,776,000. Greenspan then applied his multiplier developed from his analysis of comparable companies. The methodology resulted in an enterprise value range between $610 million and $710 million. Greenspan added non-operating assets and subtracted debtors' total interest bearing debt to arrive at a valuation range between $168 and $268 million. From the midpoint of the range, Greenspan concluded that the debtors were solvent by $218,000,000. To construct his balance sheet, Greenspan allocated this solvency value across the debtors' balance sheet items to arrive at his conclusion. Debtors claim that "Greenspan's failure to perform an independent balance sheet analysis, and his reliance instead on the valuation number he derived from his market multiple analysis . . . invalidates Greenspan's purported balance sheet adjustments, and thus renders the Bankruptcy Court's reliance on these adjustments reversible error."

The Court agrees with the lenders that the Bankruptcy Court's approach to valuing the debtors assets represents a painstaking model of the balance sheet test under the 'fair valuation' standard of 11 U.S.C. § 101(32). The Bankruptcy Court drew on the best elements of each experts' report and relied on Greenspan's business enterprise valuation to corroborate its balance sheet test. Moreover, the debtors failed to carry their burden of proving insolvency because Cleveland improperly based his valuation on liquidation values which ran counter to the requirement to treat

the debtors as a going concern.  The bankruptcy court properly assessed each asset's value as though is was part of an operating economic unit.  In sum, the fact that Heilig was a going concern added value to the company's assets that should not be ignored in determining its solvency.

The bankruptcy court properly rejected any reliance on liquidation values in its analysis into the debtors' going concern value.  The parties do not dispute that the debtors were operating as a going concern at the time of the transfers.  Accordingly, when faced with serious conflicts in the evidence, the bankruptcy court necessarily started with the debtors' balance sheet prepared according to generally accepted accounting principles (GAAP) and then modified the values to more accurately reflect the debtors' financial condition based on other available evidence.  See In re Joshua Slocum, Ltd., 103 B.R. 610, 623-24 (Bankr. E.D. Pa. 1989) ("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP.").  In addition to the Form 10-K filed on May 30, 2000 indicating shareholder equity in excess of $500 million, the lenders note that Heilig reported operating income on February 29, 2000 in excess of $150,000,000.  For the quarter ending May 31, 2000, Heilig reported operating income of more than $26,000,000.

"Where the going concern value is the appropriate standard, the appraisal must take into account the additional value element which flows from the combination of the various assets to an economic unit."  Collier on Bankruptcy, ¶ 101.32[4], 101-116; see also In re DAK Industries, 170 F.3d 1197, 1200 (9th Cir. 1999) ("If the debtor was a going concern, the court will determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time.").  Contrary to the debtors' interpretation of In re Trans World Airlines, nothing therein prohibits consideration of the entire economic unit when assessing the conversion into cash value of a company's assets.

Judge Tice specifically noted that he could not wholly endorse either report and, instead, endeavored to construct his own balance sheet test.  In doing so, Judge Tice relied to some extent on values assigned by both Cleveland and Greenspan as well as the GAAP financial statements authored by the debtors where the record lacked sufficient evidence.  Throughout Judge Tice's opinion, the consistent approach is for the court to reject any value that takes into account post-petition events as one would expect when valuing the assets of a going concern.  Judge Tice appropriately considered elements of value created by the fact that the debtors operated as a going concern thereby assessing a value based on a sale over a reasonable period of time rather than at a distressed sale.

Additionally, the debtors insist that the bankruptcy court erred in relying on Greenspan's report even after it rejected his use of a control premium to add value.  To arrive at his enterprise value, Greenspan included a forty percent control premium when determining his multiples.  The debtors argue that if the control premium is removed from the multiples, the enterprise value range shrinks from $610 to $710 million down to $410 to $510 million.  After adding the same assets and subtracting the same liabilities as before, the value range is between negative $35 million  to $59 million with a midpoint of $12 million.  Therefore, the debtors claim that the control premium inflated Greenspan's final solvency number by more than $200 million and, therefore, made his report unreliable.  Assuming the debtors' are correct, they are still solvent by as much as $59 million; a significant difference from Cleveland's total stockholder equity of negative $330,181,000.  The debtors remained solvent in the absence of the control premium.

The debtors also contend that the bankruptcy court misapplied the holding in <u>Trans World Airlines</u> and failed to value the assets based on their conversion into cash within a reasonable period of time.  To the contrary, Judge Tice performed an asset-by-asset valuation while recognizing that

the assets of a going concern are more valuable because the seller is not forced to sell and may take

a reasonable time wait for a higher offer.  Fundamental to these valuations is the assumption that the

company will continue to operate rather than seek to liquidate.

iv.

The following chart compares the balance sheet values as of May 31, 2000 to the values

assigned to those same assets and liabilities by the experts (all amounts expressed in thousands):

| | Balance Sheet Values | **Cleveland** Assigned Values | **Greenspan** Assigned Values |
|---|---|---|---|
| Cash | $ 6,451 | $ 6,451 | $ 6,451 |
| Accounts Receivable | 136,530 | 81,918 | 119,131 |
| Retained Interest | 138,503 | 0 | 138,503 |
| Inventories | 363,382 | 215,909 | 363,382 |
| Other Receivables | 82,999 | 26,790 | 79,599 |
| Prepaid Expenses | 26,562 | 0 | 26,562 |
| Net Assets Held for Sale | 13,782 | 5,800 | 0 |
| Property and Equipment | 285,515 | 49,417 | 179,220 |
| Other Assets | 159,586 | 73,263 | 99,192 |
| Goodwill | 141,400 | 0 | 0 |
| **TOTAL ASSETS** | **1,354,710** | **459,548** | **1,012,040** |
| | | | |
| Current Long-Term Debt | $ 681 | $ 681 | $ 681 |
| Accounts Payable | 118,026 | 118,026 | 118,026 |
| Accrued Expenses | 131,090 | 129,017 | 131,090 |
| Deferred Revenue | 28,506 | < 26,873 > | 28,506 |
| Long-Term Debt | 515,737 | 515,737 | 515,737 |
| Deferred Income Taxes | 42,258 | 0 | 0 |
| Other Liabilities | 0 | 53,141 | 0 |
| **TOTAL LIABILITIES** | **826,298** | **789,729** | **794,040** |
| **TOTAL STOCKHOLDER EQUITY** | **518,412** | **< 330,181 >** | **218,000** |

In re Heilig-Meyers, 319 B.R. at 464.

The bankruptcy court arrived at its own set of figures (the asterisk indicates that the Court's

15

value corresponds to the value listed in the company's balance sheet for May 31, 2000):

| | BANKRUPTCY COURT VALUES | Cleveland Assigned Values | Greenspan Assigned Values |
|---|---|---|---|
| Cash | $ 6,451 | $ 6,451 | $ 6,451 |
| Accounts Receivable | 119,131 | 81,918 | 119,131 |
| Retained Interest | 138,503* | 0 | 138,503 |
| Inventories | 363,382* | 215,909 | 363,382 |
| Other Receivables | 28,105 | 26,790 | 79,599 |
| Prepaid Expenses | 26,562* | 0 | 26,562 |
| Net Assets Held for Sale | 13,782* | 5,800 | 0 |
| Property and Equipment | 64,417 | 49,417 | 179,220 |
| Other Assets | 73,263 | 73,263 | 99,192 |
| Goodwill | 0 | 0 | 0 |
| **TOTAL ASSETS** | **833,596** | **459,548** | **1,012,040** |
| | | | |
| Current Long-Term Debt | $ 681* | $ 681 | $ 681 |
| Accounts Payable | 118,026* | 118,026 | 118,026 |
| Accrued Expenses | 129,017 | 129,017 | 131,090 |
| Deferred Revenue | 28,506* | < 26,873 > | 28,506 |
| Long-Term Debt | 515,737* | 515,737 | 515,737 |
| Deferred Income Taxes | 0 | 0 | 0 |
| Other Liabilities | 0* | 53,141 | 0 |
| **TOTAL LIABILITIES** | **791,967** | **789,729** | **794,040** |
| **TOTAL STOCKHOLDER EQUITY** | **41,629** | **< 330,181 >** | **218,000** |

The bankruptcy court then proceeded to explain how it arrived at each value. Consistent throughout the court's analysis is the premise that the business must be valued as a going concern; any attempts by either party to include values or consider events that approached a liquidation analysis were rejected:

   **(A) Cash and Goodwill**: The experts did not adjust the value of the cash and did not assign a value to goodwill, so the court did not make any changes to these assessments;

   **(B) Accounts Receivable**: The court adopted Greenspan's figure because Cleveland relied, in part, on figures from actual sales during the bankruptcy proceedings, which resulted in a forty percent discount from actual book value. According to the Court, "[t]he proper way to value debtors' assets is to determine how much they would have fetched from a willing buyer on the date of the alleged preferential transfer." Id.

   To arrive at the accounts receivable amount in his balance sheet, Greenspan began with the GAAP balance sheet amount for receivables at $136.5 million and reduced by $17.4 million for amounts that were delinquent by more than 90 days. Greenspan analyzed the accounts receivable from December 1999 through May 2000 and concluded that "there had been no degradation in collection patterns and therefore a continued expectation of collectability." The value for accounts receivable offered by the experts differed by $37,213,000. A reasonable conclusion would have been to fall back on the book value reported by the company as a reliable assessment of the asset's value. However, there is no clear error in reducing the value for delinquent accounts. Moreover, the debtors have not demonstrated how the court's rejection of the control premium renders reliance on Greenspan's value of accounts receivable, and his decision to reduce the value by the delinquent accounts, clearly erroneous.

   **(C) Retained Interest**: Again, Cleveland relied on the performance of the Master Trust *after*

17

May 25, 2000 to value the debtors' retained interest in those accounts at zero. The court rejected any attempt to rely on post-May 25 circumstances. Reliance on post-petition effects on the value of the debtors' assets and liabilities would run contrary to the legal precepts applicable in a going concern analysis.

The debtors contend that the bankruptcy court impermissibly assigned the retained interest in the accounts receivable a value based on its value to the debtor rather than the amount of money the asset could garner if sold. The Court understands the debtors to argue that this retained interest should have a zero value because the debtors were unable to refinance the securitization arrangement at the same 85% rate and, therefore, the debtors' retained interest of 15% could not be converted into cash. The debtors argue that the remaining 15% did not have any value because investors were no longer willing to pay up to 85% of the value of the accounts receivable. According to the debtors' CFO Paige Wilson, any refinancing of the securitization arrangement would be between 65% and 75% of the value of the accounts receivable. It appears that Greenspan included this retained interest as an asset because up until the bankruptcy petition, when the company stopped servicing the receivables, collections continued their historical pace; therefore, Greenspan saw no potential for a hitch in the cash flow back from the Master Trust on the date of the transfers so that the retained interest in the accounts receivable had value.

The debtors insist that the retained interest could not be converted into cash. If correct, this would eliminate $138,503,000 from debtors' total assets. The lenders believe that this remaining portfolio of accounts receivable remained valuable based on the historical performance of the portfolio. Greenspan reviewed the cash flow of the portfolio and noted that it consistently experienced a flow equal to 7% principal and 2% interest per month and that these payments continued up until the moment debtors filed for bankruptcy protection. Additionally, Greenspan

18

began with the debtors' own assessment of the value of the interest and conducted his own analysis to determine that $138 million represented a "fair value" for the retained interest.

In contrast, Cleveland valued the retained interest based on a hypothetical sale of the portfolio to a financial buyer. Cleveland assumed that the buyer would discount the portfolio (worth an estimated $1 billion) by 31% and that this discounted purchase price would be insufficient to cover the $826 million of secured debt in the Master Trust. Implicit in Cleveland's analysis is that the purchaser would insist on a discount, presumably because of the bankruptcy petition and the performance of the portfolio in the aftermath. As such, Cleveland considered post-petition effects on the receivables, convinced that the discount effect of the bankruptcy would reduce the value of the portfolio to such an extent that any sale would not cover the amount owed.

Cleveland's method of assessing the value of this asset does not comport with the overarching principle that the assets must be valued as if sold by a going concern over a reasonable period of time. The Court must determine whether Judge Tice clearly erred in rejecting Cleveland's finding in favor of the book value (and Greenspan's assessment). Cleveland severely discounted the value of the retained interest in his hypothetical sale. The bankruptcy court would have committed clear error by adopting this value in the context of a going concern analysis. As a going concern, Greenspan concluded that the accounts receivable portfolio maintained its historical collection performance up until the bankruptcy filing. Clearly, the evidence supports a finding that the retained interest remained valuable and could be converted into cash; therefore, the bankruptcy court did not commit clear error in assigning book value to the asset.

**(D) Inventories**: The same is true of Cleveland's inventory analysis. The court likened Cleveland's values to those that would be achieved at distress sales, noting that he began with the "percentage of cost recovered" at a going out of business sale. Therefore, the court could not

19

properly rely on Cleveland's proposed value.

**(E) Other Receivables**: The court largely adopted Cleveland's analysis of this category with one exception where Cleveland used a price figure for one particular receivable based on a price offered during the bankruptcy proceeding, reflecting a 93.3% reduction from book value. The court accepted the receivable's book value, minus a 5% percent collection cost, to value the asset at $1,415,000. The Court finds no clear error.

**(F) Prepaid Expenses**: Cleveland valued these assets at zero because, he claimed, they could not "be sold independently of all other assets to a willing buyer." Id. at 465. The court concluded that "[t]he value of prepaid expenses may be realized when related assets are sold" because a purchaser may be willing to pay more for an asset that is insured for the remainder of a contract term. Therefore, the court adopted the balance sheet value. Presumably, this figure represents value added to any of the assets for which such expenses are paid, therefore increasing the value of the asset would when sold.

The debtors contend that the decision to assign this asset its book value is "both legally and factually unsupportable." Debtors insists that these prepaid expenses are not saleable assets that should not be assigned a value for purposes of an insolvency analysis. The bankruptcy court in the Trans World Airlines case concluded that the prepaid expenses held no value because they could not be converted into cash in a reasonable period of time. See TWA v. Travellers Int'l AG (In re TWA), 180 B.R. 389, 421 (Bankr. D. Del. 1996); rev'd on alternate grounds, 208 B.R. 890 (D. Del. 1996). While the Court finds it a dubious proposition to include prepaid expenses in a balance sheet analysis because of the difficulty of converting the specific asset, e.g. prepaid insurance premiums, into cash over a reasonable period of time, nevertheless, this asset is typically included in balance sheet

valuations[4] and the Court cannot say, based on the record, that this balance sheet item has a zero value. The Bankruptcy Court found that the debtor could realize value from the prepaid expenses as a component of the associated asset's purchase price. Therefore, inclusion of prepaid expenses for purposes of this balance sheet inquiry was proper and the Bankruptcy Court did not commit clear error in assigning these assets their book value.

**(G) Net Assets held for Sale**: The court adopted the balance sheet value because Cleveland decreased the value based on actual sales occurring after May 25, 2000. Again, the Court finds that the record before the Bankruptcy Court supports this finding. The book value is greater than both Cleveland's assessment of the asset ($5,800,000) and Greenspan's valuation ($0). Greenspan's report does not explain why he reduced the value of these assets to zero. Therefore, in the absence of evidence, the bankruptcy court properly relied on the book value as a measure of the asset's value in the hands of a going concern.

**(H) Property and Equipment**: The court accepted Cleveland's value for these assets with one exception. On May 31, 2000, real property had a book value of $142,521,000. Cleveland reduced this value to $60,000,000, in part, based upon post-petition auction sales and appraisals performed by DJM Trammell Crow Company. The court noted additional appraisals that assigned a higher value to the real property and, again, the court commented on the need to assess the value as a going concern rather than liquidation values. As a result, the Court added $15,000,000 to Cleveland's amount.

In support of Judge Tice's decision in this category, lenders highlight the conflicting appraisals which were substantially different with regard to certain properties. Lenders contend that

---

[4]See e.g. In re Toy King Distributors, 256 B.R. 1, 62 (Bankr. M.D. Fl. 2000); In re Coated Sales, Inc., 144 B.R. 663, 669 (Bankr. S.D.N.Y. 1992).

faced with disparate appraisal figures, the bankruptcy, in its discretion, could assign the property its book value or determine its own fair valuation amount based on the evidence.  Rather than rely on the book value, Judge Tice adjusted Cleveland's figure upward by 25% to reflect a fair valuation. This finding shall be afforded discretion as it is without clear error.

**(I) Other Assets**: The court rejected Greenspan's value for this category, which includes notes receivable and the value of debtors' investment in a low income housing partnership, because Greenspan assigned a value derived from debtors' liquidation assessments.  As was consistent throughout the valuation analysis, the court discounted any attempt to include values that did not treat the debtor as a going concern on May 25, 2000.  The court's decision to adopt Cleveland's value of this category of assets is supported by the record before the court.

**(J) Liabilities, generally**: Consistent with its determination to value the debtors at the time of the transfers, when the bankruptcy petition remained unknown, the court ignored any decline in the value of the debtors' liabilities resulting from post-petition fears that the debtors would not honor their debts.  Id. at 466.  The experts adopted the book value for debtors' long-term debts, debtors' current long-term debt and accounts payable and the court accepted these values as well as the experts' decision to assign a zero dollar amount to deferred income taxes.  The court agreed with Cleveland that accrued expenses should be reduced by $2,073,369 to eliminate a reserve which the court classified as an "artificial liability."  As for the appraisals of deferred revenue, the experts differ by more than $55,000,000.  Greenspan appraised the deferred revenue equal to the balance sheet value.  Cleveland assigned deferred revenue a positive value based on an accounting policy shift.  The court reasoned that it must adopt Greenspan's value because it accepted his value for inventory and accounts receivable.  Finally, the court rejected Cleveland's other liability figures, so called contingent liabilities, because they represent possible future expenses rather than actual

22

liabilities present as of May 25, 2000.

Debtors claim that the bankruptcy court improperly disregarded the contingent liabilities when it reduced the "other liabilities" amount from approximately $53 million to zero. The court excluded $21,429,000 under the synthetic leases. Debtors contend that the court's rejection of this liability as a future expense is not correct with regard to synthetic leases. Debtors assert that by ignoring the synthetic lease obligations, the court failed to take notice of the requirement that "[a] determination of insolvency under 11 U.S.C. § 1001(32)(A) . . . requires the inclusion of all contingent liabilities . . . regardless of their respective degrees of probability." In re Merry-Go-Round Enterprises, Inc. v. The CIT Group/Commercial Serv., Inc., 229 B.R. 337, 343 (Banrk. D. Md. 1999).

The lenders insists that the bankruptcy court did not declare that these liabilities did not exist. Rather, the court stated that they should be assigned a zero value because they did not exist as of May 25, 2000. Lenders maintain that while contingent liabilities are to be considered in a solvency analysis, not all contingent liabilities are to be considered as part of a going concern analysis. "[C]ontingent liabities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." In re Trans World Airlines, 134 F.3d at 197-98. Lenders contend that the bankruptcy court properly excluded projected costs of operating the business in the future.

Cleveland's report predicted that these liabilities would arise from the debtors' breach of the leases and from a sale of the debtors' assets. Greenspan, in analyzing Cleveland's report, noted that Cleveland assumed that the company was going out of business and assumed that the debtors breached the synthetic leases. Therefore, the Bankruptcy Court properly rejected these liability amounts as costs associated with dissolution and not foreseeable liabilities of a going concern.

23

Moreover, Cleveland's deficiency amounts were based on an understated value of the leased property.  The appraisal by Hilco Real Estate, LLC, purporting to assess fair market value, valued these properties at $35.3 million, more than $18.3 million higher than the appraisals relied on by Cleveland in his analysis.

The court also excluded the tax recapture liability ($7.8 million according to debtors) which would be generated if the debtors sold their interest in a low income housing partnership.  The debtors contend that because the bankruptcy court included the value of that partnership interest as an asset, it must include the corresponding tax liability that attaches to the interest.  Judge Tice correctly observed that this liability would only be triggered if the debtors sold their interest which was not expected to occur as of May 25, 2000.  The Court finds that this conclusion is without clear error.

v.

The Bankruptcy Court did not confine itself to a bookkeeper's view of the balance sheet.  As an additional measure, the court examined the circumstances surrounding the debtors' condition on May 25, 2000.  The court considered the totality of the debtors' circumstances, in part, because of the wide disparity between the experts' appraisals and their solvency conclusions.  Based on this information, the court confirmed the findings of its own balance sheet test that debtors were, in fact, solvent on the date of the transfers.

The court began by noting the Fourth Circuit's approval of a totality of the circumstances test to resolve disputes over fraud under 11 U.S.C. § 523(a)(2) and fraudulent transfers under § 548(a).  See In re Heilig-Meyers, 319 B.R. at 467-68; see also Boyuka v. White (In re White), 128 Fed. Appx. 994, 998-99 (4th Cir. 2005) (unpublished) (inferring intent to deceive from the totality of the circumstances in assessing an exception to discharge under 11 U.S.C. § 523(a)); Mac Panel Co. v.

24

Va. Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002) (considering totality of circumstances in evaluating equitable mootness for purposes of challenging a confirmed reorganization plan). Additionally, at least one bankruptcy court applied a similar test in a preference setting to assist its solvency determination.  See Lawson v. Ford Motor Co. (In re Roblin Indus.), 127 B.R. 722, 724 (Bankr. W.D.N.Y. 1991), aff'd. 78 F.3d 30 (2d Cir. 1996) (noting that the debtor's overall financial plight made it unlikely that it could obtain new sources of financing).  Judge Tice considered the debtors' "history of profits or losses, reported negative or positive net worth, conditions of the market in which debtors competed, liquidity, bankruptcy schedules and dividend history."

The debtors take issue with the bankruptcy court's reliance on the totality of the circumstances analysis.  However, the debtors miss the point of the court's additional analysis.  The court did not rely exclusively on the totality of the circumstances to declare the debtors solvent.  Rather the court used the surrounding circumstances to buttress its solvency analysis under the balance sheet test.  Obviously, the wide disparity between the experts' conclusions required that the court closely examine the entirety of the debtors' situation to undergird its primary conclusion that the debtors were solvent on the transfer date.  The Court finds no error, clear or otherwise, in Judge Tice's factual findings regarding the debtors' relative financial strength.

(a) History of Income or Loss

Debtors's history on this point is neutral.  While "not a picture of strength," it does not "show a company in desperation."  In re Heilig-Meyers, 319 B.R. at 468-69.  Debtors reported net income in 1996 and 1997 but recorded net losses in 1998 through 2000.  Over the five year period, debtors' total revenue exceeded $10,000,000,000.  If the court removed almost $90,000,000 in one time expenses, debtors' consolidated net income from 1996 through 2000 totals $54,518,000 with a net income of $4,409,000 in 2000 (debtors incurred a one time loss of over $60,000,000 in 2000

25

representing a loss on sale of and write-down of assets held for sale).  Additionally, according to the debtors' own expert, the company continued to report income in the years leading up to the bankruptcy petition.  <u>See</u> <u>id.</u> at 469.

### (b) Negative or Positive Net Worth

The debtors also reported positive shareholder equity in excess of $500 million from 1996 through 2000, peaking in 1997 at $642 million and closing 2000 with a larger shareholder equity than in 1996.  Although the values reported in financial statements to shareholders are based on accounting methods that are inapplicable to the determination of solvency under the Bankruptcy Code, such reported values are "competent evidence from which inferences about a debtor's insolvency may be drawn."  <u>In re Roblin Indus.</u>, 78 F.3d at 36.  As of May 31, 2000, debtors reported assets of approximately $1.3 billion and liabilities of $800 million; not the picture of an insolvent company.

### (c) Market Conditions

Between them, the experts compared Heilig-Meyers to nine companies within the furniture industry.  Their comparisons included four of the same companies.  Of those four, only The Bombay Company reported a loss during the five years from 1997 through 2001.  The loss equaled less than one-percent of revenue for Bombay's year ending in 1997.  Restoration Hardware reported losses for the years ending in 1999, 2000 and 2001 but only the 2001 loss exceeded two-percent of revenue.  Krause's Furniture, selected by Cleveland, reported significant losses each year and declared bankruptcy in 2001.  Judge Tice concluded that "the retail furniture market cannot be described as a market in dire straits during the years immediately before and after debtors' alleged preferential transfers and bankruptcy filing."  <u>In re Heilig-Meyers</u>, 319 B.R. at 472.

### (d) Debtors' Liquidity

Certainly, debtors faced a looming liquidity crisis beginning in August of 2000.  Indeed, on the date of the transfers, debtors' near term obligations included: seasonal inventory replenishment and vendors who were tightening trade credit; $18,000,000 in bond interest due in August; and contributions to the 1998-2 Master Trust of approximately $20,000,000 per month.  However, on May 31, 2000, debtors had in excess of $6,000,000 in cash on hand and an additional $65,000,000 in available borrowings.  Debtors continued to receive $80,000,000 in monthly advances from the Master Trust.  Not until the debtors announced in August of 2000 that it would defer the $18,000,000 bond interest payment did the receivable securitization payments cease.  This ill-fated announcement set into motion a series of events that led to the bankruptcy filing.  But on May 31, 2000, there was no evidence that debtors would not be able to extend their debt maturities as they had successfully done throughout 2000.

### (e) Debtors' Bankruptcy Schedules

In <u>Matson v. Strickland</u> (<u>In re Strickland</u>), Judge Shelley explained that the court is duty bound to take judicial notice of its own records and that "the Court may exercise its discretion to take judicial notice of the bankrupt's schedules in an adversary proceeding arising from the same bankruptcy case."  230 B.R. 276, 282-83 (Bankr. E.D. Va. 1999).  Judge Shelley "reasoned that if the schedules revealed debtor was insolvent on the petition date, he was likely insolvent on the transfer date."  <u>In re Heilig-Meyers</u>, 319 B.R. at 472.  Debtors' schedules reported a book value of total assets at $1,308,308,990 and liabilities of $884,986,672.  Judge Tice found it "unlikely [that] debtors were insolvent on May 25, 2000, only to become solvent when they filed their bankruptcy petition.  Rather, this evidence would indicate, if anything, debtors were solvent on both dates."  <u>Id.</u> The Court agrees with this assessment.

### (f) Debtors' Dividend History

27

Virginia law prohibits a corporation from paying a dividend while insolvent or if the dividend would cause insolvency.  <u>See</u> Va. Code § 13.1-653(C).  The debtors' board of directors declared a cash dividend of $0.02 per share on March 22, 2000 payable on May 13, 2000.  The Court will assume that the board did not believe that it was making an illegal distribution to shareholders just twelve days prior to the financial restructuring.

vi.

On October 29, 2003, the Bankruptcy Court denied the debtors' motion for partial summary judgment and declared that the transfer of cash proceeds from the sale of two of the debtors' Puerto Rican subsidiaries, known as the Berrios Transfers, occurred outside of the preference period.  According to the debtors, the bankruptcy court found that "the Berrios proceeds were held in an escrow created outside the preference period" and that "payment of these funds to defendants under documents executed on May 25, 2000, was not a preferential transfer."  The court stated that it would issue a memorandum opinion detailing its findings of fact and conclusions of law.  However, the court never issued this opinion.

The Court agrees with the lender's position on this issue.  The conclusion that the debtors were solvent on May 25, 2000 resolves the issue of the preferential nature of the Berrios Transfers.

vii.

To overturn the bankruptcy court's decision, this Court would have to find that Judge Tice clearly erred in his factual determination that the debtors were solvent on the date of the transfers.  The debtors make a compelling argument with regard to the control premium, but at best, all they have done is question the accuracy of Greenspan's numbers so that the *exact* value of *solvency* is in doubt.  However, the debtors have not persuaded the Court that Judge Tice's ultimate finding of solvency is clearly erroneous.  The obligation to prove their insolvency rested with the debtors in the

28

court below.   The debtors failed to carry this burden when Judge Tice rejected the majority of Cleveland's findings due to his reliance on post-petition events.   Ample evidence exists to support the finding that the debtors were solvent on May 25, 2000 and nothing in the record leaves the Court with a firm conviction that Bankruptcy Court reached the wrong conclusion..   Therefore, this Court will not disturb the Judge Tice's findings on appeal.

An appropriate Order shall issue affirming the Revised Memorandum Opinion.


ENTERED this   15th   day of AUGUST, 2005


      /s/ James R. Spencer_____

JAMES R. SPENCER
UNITED STATES DISTRICT JUDGE